## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| BUTCHIE J. STEMPLE | * | |
| Plaintiff | * | |
| v | * | Civil Action No. ELH-14-1739 |
| BOBBY P. SHEARIN, et al. | * | |
| Defendants | * | |
| | * | |

***

## MEMORANDUM OPINION

On May 29, 2014, Butchie Stemple, plaintiff, a Maryland State prisoner confined at North Branch Correctional Institution ("NBCI"), filed suit under 42 U.S.C. § 1983 against Warden Bobby Shearin[1]; Keith Arnold, Chief of Security; and Kevin Lamp, Chaplain.  He also attached several exhibits to his suit.[2]  Defendants have moved for dismissal or summary judgment, ECF 13, supported by a legal memorandum and exhibits (collectively, the "Motion").  Plaintiff opposes the motion, ECF 17, supported by exhibits.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6 (D. Md. 2014).  For the reasons stated below, defendants' motion, construed as a motion for summary judgment, shall be granted.

### Plaintiff's Allegations

Stemple, who is self-represented, is incarcerated at NBCI.  He asserts that his right to practice his chosen religion was abridged by defendants on September 12, 2011, when Wicca

---

[1] Mr. Shearin served as Warden at NBCI until February 18, 2014, and is no longer employed by the Maryland Department of Public Safety & Correctional Services.

[2] Unfortunately, the exhibits are docketed, collectively as part of ECF 1, which totals 54 pages.  In other words, the exhibits do not have separate ECF numbers.

services were moved to the NBCI dining hall, where "no space" was available "to cast a magick circle."[3]  ECF 1 at 4.  Stemple explains that the magick circle is "a sacred space where Wiccans perform all rituals."  *Id*. at 4.[4]  Stemple states that he attended 58 Wicca services in the NBCI dining hall from September 12, 2011, through November 5, 2012, and claims that in each instance was denied "a meaningful service" due to the space limitation in the dining hall.  ECF 1 at 4.

In response to the change in worship practice, Stemple wrote to Chaplain Lamp on September 15, 2011.  ECF 1 at 4.  After receiving no response, plaintiff again wrote to Lamp on May 29, 2012.  ECF 1 at 4, 19-20.

On May 20, 2013, Stemple attended the Wicca service in the Special Support building.  During the service another inmate, Hector Masquera, returned a Playstation II game to him called "Shadow Hearts: Covenant."  *Id*.  After the service was over Lamp, along with unnamed correctional officers, asked Stemple and Maquera what they had passed during the service.  Stemple produced the game and gave it to one of the officers present.  The officer inspected the game and returned it to Stemple.  *Id*. at 5.  Lamp later confiscated the game as contraband after Stemple laid it down with other "religious articles" and told Stemple to return to his housing unit where a copy of the "confiscation papers" would be sent to him.  *Id*.  Stemple claims he never received any documentation of the confiscation, wrote to Lamp asking for the documentation on May 22, 2013, and received no response.  *Id*.

---

[3] "Magick" in the Wiccan faith is "the art and science of focusing your will and emotions to effect change both in the world around you and the world within you.  Magick is neither good nor evil, positive nor negative.  It is the use of the power that determines the path it will take." ECF 1 at 25.

[4] All page numbers correspond to the pagination on the court's electronic docket, rather than the page numbers on exhibits.

Stemple received notice from Lamp on May 23, 2013, stating he was suspended from attending the Wicca service, and the decision was approved by Chief of Security Keith Arnold. Stemple's suspension was based on the ground that he passed contraband during the service. However, Stemple maintains that the Playstation II game does not constitute contraband. *Id*.

On July 24, 2013, Lamp returned the game to his cell while Stemple was working at his job. Stemple claims the game was severely scratched and disabled. *Id*. at 6. As a result, Stemple wrote to Lamp and Shearin. *Id*.

With respect to the Wicca services, plaintiff alleges that he exhausted his administrative remedies through the grievance process. *Id*. at 6-9. Stemple asserts, based on the foregoing facts, that his First Amendment rights were violated by Shearin and Lamp when Wiccan services were moved to the NBCI dining hall, as the facility provided inadequate space to perform religious rituals essential to the practice of Wicca. ECF 1 at 9. Further, he asserts that Shearin, Arnold, and Lamp violated his First Amendment rights and his rights to due process when Stemple's ability to attend worship services was suspended, causing him to miss ten services. *Id*. As relief, Stemple seeks declaratory relief and compensatory and punitive damages. *Id*. at 10-11.[5]

In December 2012, Wiccan services were moved to a different location. ECF 13-3 at 2 (Declaration of Lamp). Stemple does not claim that the current location presents the same space issue as the dining hall.

### Defendants' Response

The Department of Public Safety & Correctional Services ("DPSCS") has issued a

---

[5] Stemple's claim that Lamp violated his due process rights when his property was taken and damaged, ECF 1 at 10, was dismissed by this court in its initial review of the complaint. ECF 4.

publication, Division of Correction ("DOC") Manual 140-001, titled "Religious Services Manual." ECF 13-2, Ex. 1(Manual).  It states the DOC's policy that inmates are to be provided with "reasonable and equitable opportunities to pursue religious beliefs and practices within the constraints of budgetary limitations, and consistent with the secure and orderly operation of the . . . facility."  ECF 13-2, Ex. 1 ("Religious Services Manual") at 5, §V.  When the secure and orderly operation of the prison is a concern, attendance at a religious activity may be limited or discontinued.  *Id.* at 7, §VI(F).

Beginning September 2011 through November 2012, all religious services conducted at NBCI held at the dining hall due to space and security concerns.  ECF 13-2, Ex. 2 (Declaration of Chaplain Lamp), ¶ 3.  Defendants state that the dining hall is large enough to accommodate 96 inmates at one time; and that during the relevant time period no more than 20 inmates attended the Wicca service.  Moreover, the room had important security features.  For example, the dining hall has windows at the top of the hall where officers can be stationed to monitor activities in the hall.  ECF 13-3, Ex. 2 at ¶¶ 3 and 4.  Defendants deny that the space was too small to accommodate the Wiccan group's ability to "cast a magick."  *Id.* at 1-2, ¶ 5.  They observe that, at the relevant time, there were only about 20 attendees at the services.  *Id.* ¶ 24.

In December 2012, the Wiccan services were moved to the South Gym, which consists of a gym and two multi-purpose rooms, one of which is used for Wicca services.  *Id.* at 2, ¶ 6.   The multi-purpose room, where Wiccan services continue to be held, is also large enough for the group to form the circle used for religious rituals. *Id.*

On May 23, 2013, Stemple was observed receiving the PlayStation II game from another inmate.  *Id.* at 2, ¶ 7.  Following the service, Stemple was found in possession of the game as well as several magazines that were unrelated to the Wicca service.  *Id.*  Previously, Stemple had

4

used the Wicca service as an opportunity to pass and receive items considered contraband because they were not related to the religious service. *Id*. at ¶¶ 8 and 9.   Despite being warned about this practice, Stemple committed the same offense on May 20, 2013. *Id*. at ¶ 8.  He was, therefore, suspended from attending Wiccan services for six months. *Id*. at ¶ 10.  His suspension was approved on May 23, 2013, by Chief Arnold. *Id*. ¶ 10.  Following the six month period, Stemple was automatically placed back on a list permitting him to attend religious services. *Id*. at ¶ 11.

Stemple filed four administrative grievances.  ECF 13-7, Ex. 6 (Declaration of Scott Oakley, Executive Director of the Inmate Grievance Office), at 1.  In an Administrative Remedy Procedure ("ARP") complaint dated June 9, 2013, Stemple complained that his six-month suspension from attending Wiccan services violated his First Amendment rights. ECF 13-6, Ex. 5 at 1-2.  The ARP was dismissed by Warden Shearin on June 17, 2013. *Id*. at 1.  In Shearin's response denying the ARP, he stated that Stemple was present but not participating in the scheduled religious service at the time;[6] was "mixed with inmates from other housing units"; and used the time "to pass or receive items without permission after being warned" several times not to do so. *Id*.   Stemple was also advised he remained free to practice his chosen religion within the confines of his cell. *Id*.

Stemple appealed the dismissal of his ARP to the Inmate Grievance Office ("IGO") on September 16, 2013.  But, the appeal was dismissed as untimely on October 22, 2013, on the

---

[6] The ARP investigative reports include a memorandum from Lamp indicating that "only 4 inmates  . . . were actually participating in the service" and that Stemple was part of a group of other inmates who were "sitting around joking with each other and passing contraband to one another." ECF 13-6, Ex. 5 at 5.

ground that it was not filed with the Inmate Grievance Office ("IGO") within 30 days, as required by COMAR 12.07.01.06(B)(3).  ECF 13-7, Ex. 6 at 2 (Oakley Declaration).[7]

## Standard of Review

Defendants' motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).  Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that  conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[8]

---

[7] Defendants appear to concede that Stemple appealed the Warden's denial to the Commissioner of Correction.  However, there is nothing in the record indicating what the Commissioner's response was to the appeal, nor when it was issued.  ECF 13-7, Ex. 6 at 2.

[8] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165, 167.

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.,* 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)) explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

---

instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party fails to file a Rule 56(d) affidavit at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.   *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

8

Plaintiff was notified of his right to respond to the Motion and to submit exhibits. *See* ECF 14; *see also Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). He did not file an affidavit under Rule 56(d), but he did respond to the Motion. ECF 17. In support of his suit, and with his Opposition, he attached many exhibits. See ECF 1; ECF 17-1. The exhibits include Stemple's Declaration disputing the adequacy of the dining room "to cast a magick circle," ECF 17-1 at 6, and alleging that the magick circle "is an essential element of the Wiccan religion," and is "sacred space. …" *Id*. In addition, plaintiff submitted the Declaration of inmate Michael Anderson. ECF 17-1 at 10. He, too, maintains that the dining hall was inadequate "to cast our circle to do our rituals." *Id*. Many other inmates also submitted declarations, consistent with plaintiff's claim. ECF 17-1 at 11-16. Under the circumstances, I am satisfied that it is appropriate to address the defendant's motion as one for summary judgment.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).   The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).   *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Moreover, the court may not make credibility determinations on summary judgment. *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

Generally, in the face of conflicting evidence, such as competing affidavits, summary judgment is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.   *See, e.g.*, *Boone v. Stallings*, 583 F. App'x. 174 (4th Cir. 2014) (per curiam).  However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact.  *See Anderson*, 477 U.S. at 247-48.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Anderson,* 477 U.S. at 248.  On the other hand, a court must award summary judgment if the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 252.  And, "the mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.*

Because plaintiff is self-represented, his submissions are liberally construed.  *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'"  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24 (1986)).

## DISCUSSION

<u>Exhaustion of Administrative Remedies</u>

Defendants assert that Stemple failed to properly exhaust administrative remedies regarding his claim that his First Amendment rights were violated by the inadequate space provided for congregate worship and the six-month suspension of his attendance at congregate worship.  ECF 13.

The Prisoner Litigation Reform Act provides, in pertinent part, 42 U.S.C. § 1997(e):

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. § 1997e(h).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner.  Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendant(s). *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

The DPSCS has made an administrative remedy procedure "available" to Maryland state prisoners, within the meaning of 42 U.S.C. § 1997e(a), for the submission of "grievance[s] against   . . . official[s] or employee[s] of the Division of Correction ["DOC"]."  Md. Code (2008 Repl. Vol., 2011 Supp.), § 10-206(a) of the Correctional Services Article ("C.S."); *see generally* C.S. §§ 10-201 *et seq*.  Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement."  Code of Maryland Regulations ("COMAR") 12.07.01.01B(8).[9]

_____

[9] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'"  *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted).  Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'"  *Id*. at 651, 898 A.2d at 960 (citation omitted).  Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id.*, nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC.  *See Abramson v. Correctional Med. Servs., Inc.*, 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," C.S. § 10-304, for which a claim to a different administrative body, the Sundry Claims

In the Maryland correctional system, if the particular institution in which an inmate is incarcerated provides an administrative remedy procedure, the inmate must complete the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D.

Filing a request for administrative remedy with the Warden of the Maryland prison in which one is incarcerated is the first of three steps in the Administrative Remedy Procedure process provided by the Division of Correction to its prisoners. If this request is denied, the prisoner has ten calendar days to file an appeal with the Commissioner of Correction. If this appeal is denied, the prisoner has thirty days in which to file an appeal to the Inmate Grievance Office ("IGO"). *See* COMAR 12.07.01.03; 12.07.01.05.B; *see also* C.S. § 10-206. Complaints are reviewed preliminarily by the IGO. *See* C.S. § 10-207; COMAR 12.07.01.06. If the complaint is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1). The order of dismissal constitutes the final decision of the Secretary of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). However, if a hearing is deemed necessary by the IGO, the hearing is conducted by an administrative law judge with the Maryland Office of Administrative Hearings. *See* C.J. § 10-208(c); COMAR 12.07.01.07-.08. The conduct of such hearings is governed by statute. C.S. § 10-208.

A decision of the administrative law judge denying all relief to the inmate is considered a final agency determination. However, a decision concluding that the inmate's complaint is wholly or partly meritorious constitutes a recommendation to the Secretary of DPSCS, who must

---

Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

make a final agency determination within fifteen days after receipt of the proposed decision of the administrative law judge.  *See* C.S. § 10-209(b)-(c).

In either event, the final agency determination is subject to judicial review in Maryland state court, so long as the claimant has exhausted his/her remedies.  *See* C.S. § 10-210.  But, an inmate need not seek judicial review in state court in order to satisfy the PLRA's administrative exhaustion requirement.  *See*, *e.g.*, *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir.) ("[A] prisoner who uses all administrative options that the state offers need not also pursue judicial review in state court."), *cert. denied*, 537 U.S. 949 (2002).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process.  *Chase v. Peay*, 286 F. Supp. 2d 523, 530 (D. Md. 2003), *aff'd*, 98 Fed. App'x. 253 (4th Cir. 2004); *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

Administrative remedies must, however, be available to the prisoner, and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th

14

Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).  The Fourth Circuit addressed

the meaning of "available" remedies in *Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008):

> [A]n administrative remedy is not considered to have been available if a
> prisoner, through no fault of his own, was prevented from availing himself of it.
> *See Aquilar-Avellaveda v. Terrell*, 478 F. 3d 1223, 1225 (10th Cir. 2007); *Kaba v.
> Stepp*, 458 F. 3d 678, 684 (7th Cir. 2006). Conversely, a prisoner does not exhaust
> all available remedies simply by failing to follow the required steps so that
> remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548
> U.S. 81, 89 (2006). Rather, to be entitled to bring suit in federal court, a prisoner
> must have utilized all available remedies "in accordance with the applicable
> procedural rules," so that prison officials have been given an opportunity to
> address the claims administratively. *Id.* at 87. Having done that, a prisoner has
> exhausted his available remedies, even if prison employees do not respond. *See
> Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

Administrative remedies were available to plaintiff.  Therefore, as a prisoner, plaintiff is

subject to the strict requirements of the exhaustion provisions.  *See Porter v. Nussle*, *supra,* 534

U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging

unconstitutional conditions and suits alleging unconstitutional conduct).  If defendants show that

a claim is subject to the ARP process but has not been exhausted, the court may not consider the

merits of the claim.  *See Jones v. Bock*, 549 U.S. at 220; *see also Woodford v. Ngo*, 548 U.S. 81,

90-91 (2006).

In raising the defense of failure to exhaust administrative remedies, defendants assert that

Stemple filed an ARP, NBCI-3152-11, on  October 11, 2011, regarding the inadequacy of the

space provided in the dining hall for Wiccan services.  ECF 13-4, Ex. 3.  The ARP was denied

by defendant Warden Shearin on October 25, 2011, and Stemple appealed the denial to the

Commissioner of Correction on November 1, 2011.  *Id.* at 1-5.  The Commissioner of Correction

denied the appeal stating that Stemple had provided no additional information entitling him to

relief.  *Id.* at 3.  Stemple appealed the Commissioner's response to the IGO, which dismissed the

complaint for "failure to state a claim upon which administrative relief could and should be

granted" on February 27, 2012.  ECF 13-7, Ex. 6 at 1-2.  Stemple appealed the IGO's dismissal to the Circuit Court for Allegany County where it was dismissed on January 22, 2013.  *Id*. at 2. Without considering Stemple's response to the allegation that this claim has not been administratively exhausted, I find on the record presented by defendants that the claim was properly exhausted and the merits of the claim regarding the adequacy of the dining hall space shall be considered herein.

With regard to Stemple's claim that his six-month suspension violated his First Amendment rights, defendants provide the following information regarding exhaustion of administrative remedies.  On June 9, 2013, Stemple filed an ARP (NBCI-1497-13) regarding his suspension which was denied by defendant Shearin on June 17, 2013.  ECF 13-6, Ex. 5 at 1-5. The receipt indicating Stemple received the warden's response is dated June 21, 2013.  *Id*. at p. 7.   There is no record of an appeal to the Commissioner of Correction or the date of the Commissioner's response.  Nevertheless, Stemple appealed the matter to the IGO on September 16, 2013, where it was administratively dismissed on October 22, 2013, because it had not been filed within 30 days of the date of the Commissioner's response.  ECF 13-7, Ex. 6 at 2.

Stemple asserts that he filed a timely appeal to the Commissioner of Correction with regard to ARP 1497-13, but the Commissioner never responded.  ECF 17 at 5.  Stemple argues that the time constraints imposed on defendants are regularly violated without consequence.  *Id*. at 6.  Stemple's argument is well taken, inasmuch as the record supports that the Commissioner did not respond to his appeal and the IGO dismissed the grievance for untimeliness, not for failure to appeal to the Commissioner.  I find in this instance Stemple was prohibited from properly exhausting administrative remedies due to circumstances beyond his control and, as

such, the administrative remedy procedure was unavailable to him.  The merits of this claim shall also  be addressed below.

<u>First Amendment Claim</u>

"Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).  But, with respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment.  *See Turner v. Safley*, 482 U.S. at 78, 89 (1987); *Cruz v. Beto*, 405 U.S. 319, 322 (1972).   That retained right is not unfettered, however.   Prison restrictions that impact on the free exercise of religion but are related to legitimate penological objectives do not run afoul of the Constitution.  *See Turner v. Safely*, 482 U.S. at 89-91.

The test to determine if the restrictions are justified requires examination of whether there is a rational relation between the asserted governmental interest and the regulation in question. In addition, this court must examine whether there are alternative means of exercising the right asserted; whether accommodation of the right will impact on the orderly operations of the prison; and whether readily available alternatives to the regulation would be less restrictive.

An additional consideration in this case is the standard provided by the Religious Land Use and Institutionalized Persons Act ("RLUIPA").   The act provides, in part, 42 U.S.C. § 2000cc-1(a) (2000):

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

<u>Worship Location</u>

Stemple states in opposition to defendants' Motion that the dining hall was inadequate for Wiccan services because the tables and seats used for dining are bolted to the floor and the space between the tables and the wall is approximately five to six feet.  ECF 17.  Further, Stemple explains that the magick circle cast during Wiccan services is a sacred space where no furniture or other items are to be inside the circle.  In his Declaration, Stemple avers, in part:

> 3.  The dining halls do hold 96 inmates, which is fine for dining, but it does not have any unobstructed space to cast a magick circle.  During the Casting the Master of Ceremonies has to walk the perimeter of the Circle while casting it. The Millennial Kingdom states that the first thing you do is clear the area and move furniture back out of the way.  *See* State's Exhibit 3, 000006, paragraph 2.  Also see attached example of dining hall #1.

> 4.  The magick circle is an essential element of the Wiccan religion.  The Master of Ceremonies walks the perimeter stopping at each quarter to call upon the guardians for each quarter.  North is Earth, East is Air, South is Fire, and West is Water.  The magick circle is the sacred space that protects those inside while they perform the ritual, building up magick energies to be released.

> 5.  Not being able to cast a magick circle has injured plaintiff and his fellow Wiccans.  Not being able to cast our circle is dening [sic] us the essential part of our religion.  Not having the circle prevents us Wiccans from doing our rituals, commune with the God and Goddess, and to pay tribute to our God and Goddess on our Holy days.  Dening [sic] Wiccans the opportunity to cast our circle would be like locking the doors of a church and telling everyone that they're not allowed to come in and have service and pray.

ECF 17-1 at 6-7, ¶¶ 3 – 5.  Six other inmates make similar assertions in their declarations.  *See* ECF 17-1 at 10-16.  Stemple adds that he is unable to practice his faith in his cell due to inadequate space.  *Id*. at 7.

In addition, Stemple attached to his Complaint several pages of text regarding the Wiccan religion. ECF 1 at 21-25.  The circle Stemple refers to is described as "a circular boundary drawn in visionary blue flames or white light that protects the Witch from outside forces while

conducting ritual magick." *Id.* at 25.  It is "considered the doorway between the worlds and allows us to move between the physical and spiritual world." *Id.*  The size of the circle is traditionally nine feet in diameter; however, "[t]o arrive at the ideal size, all should stand in a Circle facing inward and hold hands. Then move slowly outward, with arms outstretched, until your arms are extended as far as possible." *Id.* at 23.   The text goes on to explain that "[w]hat is important is that such a Circle will contain the group comfortably, without fear of breaking the boundaries." *Id.*  None of the text provided by Stemple specifically prohibits furniture or other items being within the circle.

Indeed, Stemple's assertions regarding the requirements for the circle find no support in other publications regarding the casting of the circle.   The circle's purpose and importance is described as follows:

> The predominant ritual and social space form is the circle. As in ancient times, the circle represents many concepts, including wholeness, balance, the cycles of Nature, continuity, partnership, and interconnectedness. The circle is used by individuals in personal rituals as well as by large and small groups for group rituals and festivals. The circle form facilitates shared experience and encourages participation.

The Sacred Well Congregation: *Overview and Guide for Wiccans in the Military,* 3rd edition, at 18.

In addition, the literature describes the directions of the circle being marked and are usually marked by different colored candles: green for North, yellow for East, red for South and blue for West. *Id* at 22.  "A white or purple candle representing the Divine unity of the sacred Circle may be in the center." *Id.*  The perimeter of the circle is sometimes "marked with a cord, flowers, corn meal, stones, or other sacred objects." *Id.*  In either the literature Stemple provides or the literature searched online, the court is unable to find support for Stemple's assertion that the circle must be free and clear of all furniture or other items in its center.

Notwithstanding the absence of evidence lending credence to Stemple's belief that the sacred Circle must be free and clear of extraneous items, the sincerity of Stemple's belief is not for this court to judge.  Religious observances need not be "uniform to merit First Amendment protection."  *Morrison v. Garraghty*, 239 F. 3d 648, 659 (4th Cir. 2001); *see also Dettmer v. Landon*, 799 F. 2d 929, 932 (4th Cir. 1986) (concluding that prison officials may not deny religious articles to Wiccans based on the officials' definition of what constitutes a religion).  "Courts are not arbiters of scriptural interpretation."  *Thomas v. Review Bd.,* 450 U.S. 707, 716 (1981).    Moreover, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."  *Id*. at 714.

Notably, Wiccan services are now held in a multi-purpose room.  And, Stemple seems to agree that the current location for services is an adequate space to accommodate the Wiccan practices.[10]

### Six month suspension from congregate worship

Stemple's response in opposition regarding his suspension focuses primarily on his argument that the PlayStation II game was not contraband.  His argument is without merit. Defendants assert that "any item passed or received at a religious service that is not related to the service is considered contraband."  ECF 13-3, Ex. 2 at 2; *see also id.* at 6 (noting that only four attendees were participating in the service and passing of contraband had been observed for three consecutive weeks during Wiccan services).  Stemple does not claim the game was related to religious services, nor does he deny he had been warned on prior occasions that passing items during religious services is prohibited.  Where there is a legitimate security concern at issue, such as insuring compliance with rules of behavior during worship services, temporary

---

[10] In light of my rulings, I need not resolve defendants' contention that plaintiff's claims for equitable relief are moot.  *See* ECF 13-1 at 7-9.

suspension of attendance at congregate worship does not violate the First Amendment. *See Turner*, 482 U.S. at 89-91 (restrictions that impact on the free exercise of religion but are related to legitimate penological objectives do not run afoul of the Constitution). Stemple was not required to take action to have his congregate worship privileges restored after the six-month period expired and remained free to practice his chosen religious beliefs elsewhere, alone. His assertion that he did not have adequate space in his cell to practice his faith is not convincing, as there is no evidence that he was confined to his cell at all times during his six-month suspension.

Stemple's claim regarding his suspension fares no better under RLUIPA, which permits a substantial burden on the religious exercise of prisoners where it is demonstrated that the burden is in furtherance of a compelling government interest, and is the least restrictive means of furthering that compelling government interest. The violation of rules regarding passing of unrelated items during religious services is a compelling interest that was furthered by Stemple's temporary suspension from attendance.

Stemple's claim that the six-month suspension violated his right to due process is also without merit. In the prison context there are two different types of constitutionally protected liberty interests which may be created by government action. The first is created when there is a state created entitlement to an early release from incarceration. *Board of Pardons v. Allen*, 482 U. S. 369, 381 (1987) (state created liberty interest in parole); *Wolff v. McDonnell*, 418 U. S. 539, 557 (1974) (state created liberty interest in good conduct credits). The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U. S. 472, 484 (1995).

Suspension of congregate worship opportunities after repeated warnings for violating the rule against passing items unrelated to the service were ignored is not an atypical and significant

hardship.   To the extent Stemple's claim is that he was "punished" without benefit of a disciplinary hearing, the claim is also without merit.   It is well established that the revocation of good conduct credits may not take place without first providing the inmate with the protections of procedural due process.   *See Wolff v. McDonnell*, 418 U.S. 539, 557 (1974).   However, where there is no loss of good conduct credits, the analysis applicable to the "penalty" is that found in *Sandin*.   Defendants are entitled to summary judgment on this claim.

Qualified Immunity

Defendants contend that they are entitled to summary judgment on the basis of qualified immunity as to all claims, because the evidence has established that the defendants "did not violate any already established constitutional right of which a reasonable public official should have known."   ECF 13-1 at 18.

"The doctrine of qualified immunity protects police officers and public officials from claims of constitutional violations 'for reasonable mistakes as to the legality of their actions.'" *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir.) (*quoting Saucier v. Katz*, 533 U.S. 194, 206 (2001)), *cert. denied*, 133 S. Ct. 789 (2012).   "Qualified immunity extends to protect officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'"   *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (*quoting Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir.) (*en banc*), *cert. denied*, 132 S.Ct. 781 (2011)); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

The qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury … show the officer's conduct violated a constitutional right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case – that is, [whether] it was clear to a

22

reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'"  *Merchant*, 677 F.3d at 662 (citation omitted).  The "two inquiries … may be assessed in either sequence."  *Id.* at 661-62; *accord Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The second inquiry, concerning whether the right at issue was clearly established, is "assessed in light of the legal rules that were 'clearly established' at the time" of the conduct at issue.  *Messerschmidt v. Millender*, 132 S.Ct. 1235 (2012) (citation and some internal quotation marks omitted).  "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'  In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012) (*quoting Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2078 (2011)) (some internal quotation marks and citations omitted).

In determining whether a right was clearly established, we "'ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose,' as of the date of the conduct in issue.  *Doe ex rel. Johnson v. S.C. Dept. of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir.) (citation omitted), *cert. denied*, 131 S.Ct. 392 (2010).  And, the "'nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity,'" because "'qualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations.'"  *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003) (citations omitted).  Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

Where, as here, a blanket policy requiring all religious services to be held in the dining hall was implemented, defendants' refusal to move Wiccan services to a different area of the prison during the time frame at issue was not unreasonable.  As to the location of the services, defendants are entitled to qualified immunity, which "protects law officers from 'bad guesses in gray areas,' and it ensures that they may be held personally liable only 'for transgressing bright lines.'"  *Gomez v. Atkins*, 296 F. 3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Sumner*, 973 F. 2d 295, 298 (4th Cir. 1992)).

A separate Order follows.


February 2, 2015                                                        /s/
Dated                                        Ellen Lipton Hollander
                                             United States District Judge